## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BUILDING MATERIALS RE-USE**
**ASSOCIATION**
214 N Lexington Street
Pittsburgh, PA 15208-2589

*Plaintiff,*

v.                                    Civil Case No.: _____

**UNITED STATES ENVIRONMENTAL**
**PROTECTION AGENCY;**
1200 Pennsylvania Ave. NW
Washington, DC 20460

**LEE ZELDIN, in his official capacity as**
**Administrator of the United States**
**Environmental Protection Agency;**
Mail Code 1101A
1200 Pennsylvania Ave. NW
Washington, DC 20460

*Defendants.*

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Building Materials Re-use Association ("Plaintiff") brings this action against

Defendants United States Environmental Protection Agency ("EPA") and Administrator Lee

Zeldin, in his official capacity, (collectively, "Defendants").

## INTRODUCTION

1. In February 2025, the EPA, under direction from President Donald J. Trump, began to

eliminate a host of congressionally-authorized and executive-administered programs, including

the Reducing Embodied GHG Emissions for Construction Materials and Products Program (the

"Program"). This Program was created by Congress and funded by specific appropriations of the

Inflation Reduction Act ("IRA"). Inflation Reduction Act of 2022, PL 117-169, August 16, 2022, 136 Stat 1818, 2078.

2. Over the next several weeks and months, EPA continued to eliminate the program, without any assessment of the consequences of its actions, and without any attempt to otherwise execute Congress's directive or administer its appropriations.

3. EPA's termination of the Program is unlawful. It violates bedrock separation-of-powers principles by effectively repealing a congressional enactment and impounding funds based on nothing more than the President's disagreement with policies Congress duly enacted.

4. Further, it represents textbook arbitrary and capricious agency action by failing to engage in reasoned decision-making, ignoring important aspects of the problem—including the reliance interests of hundreds of entities impacted, ignoring potential alternatives, and relying on considerations Congress did not allow.

5. When Congress enacted the IRA in 2022, it authorized the EPA to administer grants and provide technical assistance to reduce emissions from the marketplace for construction materials.

6. Congress made its intent clear regarding the reduction of emissions related to construction materials.

7. EPA engaged in a rigorous review of applications, assessed their merit under the criteria of the Program, and selected 38 grant recipients for funding, including Plaintiff.

8. After selection, Plaintiff and the 37 other grant program selectees entered into a lengthy grant approval process to effectuate the purpose of Section 60112 of the IRA.

9. Plaintiff's grant agreement was finalized on January 15, 2025, after which Plaintiff promptly began work.

10. All this work stopped once President Trump entered office. On January 20, 2025, the President issued an executive order directing federal agencies to stop disbursement of all funds under the Inflation Reduction Act, including the grant funds at issue here. *Unleashing American Energy*, Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025) ("Energy EO").

11. EPA then began implementing these executive orders. It first froze all grant funding authorized under the Inflation Reduction Act, then moved to terminate the Program, ceased review of all Program selectees, and terminated Plaintiff's grant. Ex. 1-A at ¶¶ 3–6 (Declaration of Travis Voyles, EPA Assistant Deputy Administrator) [1] and Exhibit B at EPA_00048219-00048221; Ex. 1-B at ¶¶ 5–6 (Declaration of Daniel Coogan, EPA Office of Mission Support Deputy Assistant Administrator)[2]; Ex. 1-C (Voyles email terminating Program).

12. EPA terminated grants across programs *en masse*, including Plaintiff's grant. As EPA has since admitted, it did not review individual grants—but rather reviewed "grant programs" and terminated them for "policy reasons" without distinguishing among grant recipients or activities. Ex. 1-A (Voyles Decl.); Ex. 1-M ¶¶ 13-17 (Roos Decl.)[3]. Instead, EPA conducted a broad program-level review and sent out substantively identical termination notices to all grantees. Ex. 1-D (Email from M. Wise regarding termination template); Ex. 1-E (EPA Grant Termination SOP); Ex. 1-F (EPA Form termination letter).

---

[1] This declaration was filed in *Sustainability Institute v. Trump*, No. 25-cv-2152 (D.S.C.).

[2] This declaration was filed in *Woonasquatucket River Water Shed Council, et al v. Dept. of Agriculture,* No. 25-cv-00097 (D.R.I.).

[3] This declaration was filed in *Appalachian Voices, et al. v. EPA*, No. 25-cv-01982 (D.D.C.).

13. EPA's unlawful termination of the Program thwarts Congress's mandate and has harmed and continues to harm Plaintiff who is unable to fulfill the purpose of the IRA to reduce emissions from construction materials in the U.S. marketplace.

14. EPA's unlawful termination of the Program further harms to over 100 under-resourced nonprofits and small businesses working with Plaintiff, leaving these partners without the promised support and depriving them of the tools needed to compete in an EPD-driven market.

15. EPA's unlawful termination of the Program thwarts the purpose of the IRA to achieve climate goals and create economic benefits in local communities.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law including the U.S. Constitution and the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551 *et. seq.*

17. Federal law authorizes this Court to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief. *See* Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. Additionally, the APA authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–06.

18. Plaintiff brings this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

19. Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Defendants are a United States agency headquartered in Washington, D.C. and an officer of that agency sued in his official capacity.

## PARTIES

### Plaintiff

20. Plaintiff Building Materials Re-use Association is a nonprofit organization located in Pittsburgh, Pennsylvania, with a principal address of 214 N Lexington St, Pittsburgh, PA 15208-2589. Plaintiff received a grant under the Program. EPA terminated Plaintiff's grant when it terminated the Program.

21. Founded over 20 years ago, Plaintiff is the primary national organization dedicated to supporting the U.S. building materials reuse industry. The Program represented a transformational investment opportunity, enabling Plaintiff to build tools and services to sustain the sector long after the grant period. The Program's abrupt termination has deprived Plaintiff of the opportunity to realize these long-term benefits, an affront the public interest in reducing greenhouse gas emissions from the building materials sector.

22. EPA's termination of the Program and Plaintiff's grant deprives the sector of the tools, data, and market access necessary to scale reuse activities, achieve emissions reduction and climate goals, and create economic benefits in local communities. EPA's termination also undermines the IRA's legislative intent by stalling the development of critical low-carbon product data for the built environment per this program. Plaintiff's merit-based award of the grant is proof of both the organization and the sector's potential to implement these goals.

23. Plaintiff has been directly harmed by EPA's unlawful actions. Plaintiff undertook substantial effort and made substantial good-faith investments in anticipation of the grant project and overall Program proceeding. For example, Plaintiff hired staff and executed employment contracts; drafted job descriptions and project plans; organized a national outreach webinar with over 200 participants on March 12, 2025; commenced implementation partnerships with over 100 reuse-sector organizations, potential sub-contractors, potential staff, and prospective members of technical advisory committees; and initiated coordination with eight other Program grant selectees in the salvaged materials field.

24. EPA's unexplained suspension of Plaintiff's ASAP account on March 7, 2025—followed by termination on April 30, 2025—forced Plaintiff to cover staff salaries from internal funds without clarity on the status of grant funding and reimbursement, ultimately requiring the termination of staff and the halting of all program activities effective May 1, 2025. The financial strain and disruption undermined Plaintiff's operational stability, impaired its ability to meet existing obligations, and jeopardized its future capacity to serve the national material reuse sector.

25. Further, EPA's actions have damaged Plaintiff's reputation in the national material reuse sector.  For example, EPA's actions halted the launch of a national lifecycle analysis (LCA) data collection program for over 100 under-resourced nonprofits and small businesses, leaving these partners without the promised support and depriving them of the tools needed to compete in an EPD-driven market. EPA's actions have created a loss of goodwill and erosion of trust with the nonprofit and small business partners in this space.

26. The grant's termination also thwarted Plaintiff's designated role as the national convener of the eight other Program grantees working in the salvaged materials sector. EPA's actions have

impugned Plaintiff's reputation as a national leader on these efforts, by disrupting Plaintiff's

ability to align, integrate, and amplify parallel efforts on what was intended to be a coordinated

national strategy.

27. These harms are redressable through the relief sought here, which will allow Plaintiff to

continue work on its awarded grant project and reduce embodied emissions in construction

materials.

**Defendants**

28. Defendant EPA is an independent agency in the executive branch of the United States

government. *See* 5 U.S.C. § 552; Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (July 9,

1970).

29. Defendant Lee Zeldin is the Administrator of the EPA. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### EPA's Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products Program

30. The building materials reuse sector, comprising over 1,875 establishments in the U.S.,

annually diverts approximately 1.3 million tons of construction and demolition (C&D) waste

from landfills, generates over 67,000 full-time equivalent (FTE) jobs, and supports $3.4 billion

in local wages—despite representing less than 1% of total C&D waste management capacity.

Experts estimate the sector could achieve at least a 5% reuse rate with targeted support, a sixfold

increase in impact.

31. In August of 2022, when Congress enacted the IRA, it made substantial federal

investments in cutting-edge clean energy technology, lower energy costs, and mitigating the

impacts of greenhouse gas emissions and toxic air pollution.

32. As part of that effort, Congress authorized the funding of programs aimed at

decarbonizing the U.S. industrial sector, by reducing embedded carbon emissions in construction materials in the U.S. marketplace through EPA technical assistance and direct grants to businesses, non-profit organizations, and universities.

33. One of those programs authorized by Congress was the Reducing Embodied GHG Emissions for Construction Materials and Products, Environmental Product Declaration Assistance Program.  Pub. L. No. 117-169 § 60112, 136 Stat. 1818, 2078.

34. The IRA provides "there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $250,000,000, to remain available until September 30, 2031, to develop and carry out a program to support the development, enhanced standardization and transparency, and reporting criteria for environmental product declarations that include measurements of the embodied greenhouse gas emissions of the material or product associated with all relevant stages of production, use, and disposal, and conform with international standards, for construction materials and products[.]" Pub. L. No. 117-169 § 60112, 136 Stat. 1818, 2072.

35. The Section 60112 of the IRA contemplates three categories of authorized activities: (1) providing grants to businesses that manufacture construction materials and products for developing and verifying environmental product declarations, and to States, Indian Tribes, and nonprofit organizations that will support such businesses; (2) providing technical assistance to businesses that manufacture construction materials and products in developing and verifying environmental product declarations, and to States, Indian Tribes, and nonprofit organizations that will support such businesses; and (3) carrying out other activities that assist in measuring, reporting, and steadily reducing the quantity of embodied carbon of construction materials and products. Pub. L. No. 117-169 § 60112, 136 Stat. 1818, 2072.

36. On November 2, 2023, EPA issued a Notice of Funding Opportunity for the Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products program. Ex. 1-G (EPA Notice of Funding Opportunity).

37. Pursuant to the authorization under the IRA, on July 16, 2024 the EPA announced that it would invest $160 million to support clean manufacturing and usage of construction materials.

38. As part of the announcement, EPA announced its selection of Plaintiff amongst 38 grant recipients including a range of businesses, universities and nonprofit organizations serving all 50 states.

39. Once selected, Plaintiff underwent a review process prior to final approval of the grant.

40. Following a lengthy and rigorous review process, on January 15, 2025 Plaintiff's grant agreement was signed by EPA making the grant award effective as of that date. Ex. 1-H (BMRA Grant Agreement)

41. Plaintiff grant award totaled $6,703,990.00 with a project and budget period from November 1, 2024 to December 31, 2029.  Ex. 1-H at 1 (BMRA Grant Agreement).

42. Plaintiff's grant's purpose is "to support the development, enhanced standardization and transparency, and reporting criteria for environmental product declarations (EPDs) which include the measurement of embodied greenhouse gas emissions associated with all relevant stages of production, use, and disposal, in conformance with international standards." Ex. 1-H at 4 (Grant Agreement).

43. The grant supports a national initiative to develop EPDs for salvaged building materials, a sector critical to reducing greenhouse gas emissions and landfill waste.

44. The funded project aims to create at least 300 EPDs for reuse products—an essential first step for integrating the reuse industry into low-carbon procurement frameworks.

45. The grant also included $2.3 million in pass-through participant support for more than 100 under-resourced nonprofits and small businesses nationwide.

## EPA's Termination of the Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products Program

### President Trump Issues Executive Order No. 14,154, Instructing EPA to Terminate Environmental Programs

46. Shortly after his inauguration, on January 20, 2025, President Trump issued an executive order declaring "that *no Federal funding be employed in a manner contrary to the principles outlined in this section*." *Unleashing American Energy*, Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025) ("Energy EO") at § 2 (emphasis added).

47. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*

Energy EO § 7 (emphases added), 90 Fed Reg. at 8357

48. The Energy EO forbade the disbursement of any funds that the executive branch deems inconsistent with certain agency policies. *Id.*

49. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

50. EPA then proceeded to cancel a host of grants across programs, including the Program.

EPA Terminates a host of Environmental Programs,
Including the EDP Assistance Program

51. Meanwhile, on January 28, 2025, Plaintiff transmitted its 30-day First Year Projected Performance reported to EPA Program Officer Shawn Wood.

52. On January 31, 2025, Plaintiff emailed EPA Program Officer Shawn Wood and EPA Grants Specialist Matthew Forte requesting to discuss the status of Plaintiff's grant award.

53. On January 31, 2025, Program Officer Shawn Wood responded to Plaintiff stating that he was "unable to discuss matters related to EPA grant funding." Ex. 1-I (Email from Program Officer, Shawn Wood)

54. Upon information and belief, EPA terminated Program Office Shawn Wood and made no effort to replace them.

55. On February 25, 2025, Mr. Voyles conducted a review of EPA grant programs "for consistency with Agency policy priorities." Ex. 1-A ¶ 3 (T. Voyles Decl.). He did so based on the "Assistance Number Listing" identifying entire grant programs. *Id*

56. Mr. Voyles then unilaterally—in the course of a single day—decided to terminate the Program (CFDA 66.721) "for policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.); Ex. 1-J (D. Coogan Email to T. Voyles – Feb. 25, 2025).

57. While terminations were in process, EPA put a "control" in the Automated System for Administrative Payment ("ASAP") system, and grantees could not draw down any funds. EPA applied this control at the grant program level, meaning that the single "control" applied to all grants across programs. Ex. 1-K (Email from D. Coogan ordering that a control be placed on listed ASAP accounts).

58. On March 6, 2025, an email exchange between Kathryn Loving and Daniel Coogan confirmed the directive from Mr. Voyles to eliminate that "entire" Reducing Embodied GHG

Emissions for Construction Materials and Products, Environmental Declaration Assistance Program. Ex. 1-C (K. Loving Email to D. Coogan – March 6, 2025).

59. Plaintiff discovered that its ASAP funds account was suspended as of March 7, 2025, when Plaintiff initiated a payment request on March 14, 2025.

60. Beginning in February and going into early May 2025, EPA sent form letters to grantees of various programs purporting to formally terminate those programs, and, the grant awards under those programs. EPA instructed grant managers to terminate grants with a boilerplate process, using a template response to each grantee. EPA directed grant managers to "Copy/paste email language from Grant Termination [memo]" and then attach a form termination letter to the email. Ex. 1-D (Wise Email); *see also* Ex. 1-E (EPA Grant Termination SOP); Ex. 1-F (Sample Termination Letter with placeholders).

61. On April 30, 2025, Plaintiff received a termination letter purporting to terminate Plaintiff's previously finalized and awarded grant. The letter stated that "objectives of the award are no longer consistent with EPA funding priorities." Ex. 1-L (EPA Termination Letter to Plaintiff).

62. EPA has stated its intent to terminate the Program and Plaintiff's grant award for "policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.); *see also* Ex. 1-B ¶¶ 5–6 (D. Coogan Decl.).

## LEGAL FRAMEWORK

### I.    Congress's Legislative Authority, Including the Power of the Purse, and the Separation of Powers

63. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1.

64.   Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

65. This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D.C. Cir. 1992) (internal citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

66. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

67. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

68. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

69. When Congress passes a law appropriating money for a particular purpose, it is the President's job to spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Util. Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

70. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

71. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the President has a simple duty to spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

72. The President has no constitutional power to amend or repeal statutes, *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with his own.

73. When a President intrudes on Congress's power over the purse, he violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015), and acts as a "bulwark of the Constitution's separation of powers," *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Allowing the President to usurp this power "would be clothing the President with a power entirely to control the legislation

of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

74. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings and nullify a congressional enactment to serve his policy goals.

## II.    **The Presentment Clauses**

75. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

76. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

77. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–40 (quoting *Chadha*, 462 U.S. at 951).

78. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

### III.    The Administrative Procedure Act

79. Congress enacted the APA to ensure fairness and stability in agency action by mandating reasoned decisionmaking, and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices"); *see also N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting that the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process").

80. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Tel. Coop., Inc. v. Fed. Commc'ns Comm'n*, 402 F.3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (C).

81. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), reflecting the duty of the judiciary "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

82. As to process, the APA requires an agency to "acknowledge and explain" and show "good reasons" for changes in position from prior administrations. *United States Telecom Ass'n*

*v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 706–07 (D.C. Cir. 2016) (internal citation and quotation omitted).

83. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious," an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

84. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "examine the relevant data and articulate a satisfactory explanation for its action," *id.*, "including a rational connection between the facts found and the choice made," *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020).

85. When an agency is not writing on a "blank slate" but is "changing [its] position," the agency must "provide a more detailed justification than what would suffice for a new policy" if, "for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

86. When changing policy, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). "[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." *Id.* at 30 (citation and quotations omitted). At bottom, an

agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 516.

87. Judicial review under the APA is limited to agency actions made reviewable by statute and "final agency action." 5 U.S.C. § 704. Agency actions, including agency memoranda, are "final agency action" when they "'mark[]' the 'consummation' of the agency's decisionmaking process' and result[] in 'rights and obligations being determined.'" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).

88. In sum, "[t]he role of the reviewing court under the APA is . . . fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright*, 603 U.S. at 395 (citation and quotations omitted).

## IV.    Non-statutory Constitutional and *Ultra Vires* Claims

89. Federal district courts have jurisdiction over non-statutory claims to enjoin federal officials from acting unconstitutionally or beyond their statutory authority. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Strickland v. United States*, 32 F. 4th 311, 363-66 (4th Cir. 2022). Non-statutory claims arise when federal officials act "beyond the scope of their powers and/or in an unconstitutional manner." *Id.* at 366.

90. Such non-statutory claims for review are deeply rooted in the history of the judiciary. "Indeed, the most famous case of all, *Marbury v. Madison*, was a non-statutory review case." Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1625 (1997).

91. Where plaintiffs bring non-statutory claims for injunctive or declaratory relief against federal officials, for alleged unconstitutional or *ultra vires* action, "sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (adopting J. Pillard's dissent in *Widakuswara*, 2025 WL 1288817). Irrespective of whether a district court has jurisdiction over related APA claims, sovereign immunity does not bar these claims because actions that exceed statutory or constitutional authority "are considered individual and not sovereign actions." *Strickland*, 32 F. 4th at 366 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

92. Further, to avoid "serious constitutional questions," courts must not construe federal statutes to preclude any judicial review of constitutional claims absent a "clear" statement from Congress. *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no jurisdiction under the Tucker Act for separation-of-powers claims).

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Separation of Powers

93. The allegations in the preceding paragraphs are incorporated herein by reference.

94. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

95. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

96. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

97. The President has no constitutional power to terminate funds appropriated by Congress, particularly when the termination is based on Presidential policies rather than Congress's spending directives. *See, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

98. Congress has enacted the federal grant program at issue in this case under the IRA and appropriated $250 million in funding for those programs to serve enumerated purposes specified in these statutory programs. Section 60112 of the IRA.

99. Consistent with its constitutional and statutory duties, EPA obligated funds to Plaintiff via a rigorous, regulated, and competitive grantmaking process.

100. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for the Program.

101. EPA terminated this entire grant program along multiple others *en masse* for "policy reasons." Ex. 1-A (T. Voyles Decl.).

102. EPA's decision to terminate the Program contravenes Congress's directives in the IRA to fund the statutory programs at issue in this case. *See, e.g.*, Section 60112 of the IRA(a) (appropriating "to the Administrator of the Environmental Protection Agency for fiscal year 2022 . . . $250,000,000 to develop and carry out a program to support the development, enhanced standardization and transparency, and reporting criteria for environmental product declarations that include measurements of the embodied greenhouse gas emissions of the material or product associated with all relevant stages of production, use, and disposal, and conform with international standards, for construction materials and products").

103. EPA did not identify any statutory, regulatory, or constitutional authority to terminate congressionally appropriated funds based on the President's policy preferences.

104. All the relevant constitutional powers here—the powers to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to unilaterally withhold funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

105. EPA's decision to terminate the Program authorized by Section 60112 of the IRA violates Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violates the separation of powers.

## COUNT II

### *Violation of the Presentment Clauses*

106. The allegations in the preceding paragraphs are incorporated by reference.

107. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either repeals or amends *parts* of *duly enacted statutes*" violates the Presentment Clauses. *See id.* (emphasis added).

108. EPA's decision to terminate the Program mandated by Section 60112 of the IRA violates the Presentment Clauses because it seeks to "terminat[e]" or "modify" parts of the IRA after they were passed by Congress and signed by the President. *See* Energy EO § 7.

109. In purpose and in effect, EPA's decision to terminate the Program required by Section 60112 of the IRA amends the spending provisions of the IRA, unlawfully terminating grant programs mandated by Congress, that the Executive Branch deems incompatible with

*presidential* policies wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 51-62.

110. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, EPA's decision to terminate the Program authorized by Section 60112 of the IRA seeks to repeal and amend the IRA in violation of the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

111. For these same reasons, EPA's decision to terminate the Program authorized by Section 60112 of the IRA violates the Presentment Clauses.

## COUNT III

### *Violation of the APA – Arbitrary and Capricious*

112. The allegations of the preceding paragraphs are incorporated by reference.

113. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114. EPA's policy decision to terminate Plaintiff's grant through elimination of the Program authorized by Section 60112 of the IRA is a final agency action subject to review under the APA.

115. EPA's policy decision to terminate the Program, and its actions in terminating Plaintiff's grant, are arbitrary and capricious for multiple reasons.

116. First, EPA terminated the Program, for which Congress had appropriated $250 million under the IRA without without engaging in a "reasoned analysis" for the terminations as the APA requires. *State Farm,* 463 U.S. at 57. EPA has not provided an explanation as to why terminating the entire Program was necessary to effectuate the Administration's general "policy priorities."

117. Second, EPA terminated the Program without consideration of the "serious reliance interests" of Plaintiff and its partners, as well as grant selectees and their partners, on those funds. *Fox Television Stations, Inc.*, 556 U.S. at 515. In doing so, EPA "cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025). To say that this action "'failed to consider an important aspect of the problem' would be putting it mildly." *Id.*

118. Third, EPA's decision to terminate the Program authorized by Section 60112 of the IRA relies "on factors which Congress has not intended [EPA] to consider." *State Farm*, 463 U.S. at 43. EPA terminated Program funds based on the *agency's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA.

119. Fourth, EPA decided to terminate the Program authorized by Section 60112 of the IRA without considering alternative options. *See Regents of Univ. of Cal.*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 42) ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.").

120.  For example, Defendants could have engaged in a detailed review of individual grants and how they relate to President Trump's priorities *without* terminating grant programs *en masse*, but completely failed to do so.

121. Fifth, EPA failed to consider how the wholesale termination of the Program would impact the "primary goal[s]" of IRA Section 60112. *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111, 1115 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where it failed to "consider the impact of the change on [the agency program's]

'primary purpose' or otherwise explain how it is compatible with that purpose"); see also Ex. 1-6 (Notice of Funding Opportunity).

122. The unexplained termination of these grant funds epitomizes agency action by "whim and caprice of the bureaucracy." *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring).

123. EPA's decision to terminate the Program authorized by Section 60112 of the IRA must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

### COUNT IV

*Violation of the APA – Contrary to Law*

124. The allegations of the preceding paragraphs are incorporated by reference.

125. The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "not in accordance with law." 5 U.S.C. § 706(2)(A)–(D).

126. "Courts"—not the Executive— "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412. The APA reflects the judiciary's constitutional duty "to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

127. For four reasons, EPA's decision to terminate the Program authorized by Section 60112 of the IRA is outside of the agency's statutory authority, contrary to law, and without observance of procedure required by law.

128. First, no federal law or regulation gives EPA the power to terminate funding appropriated by Congress and obligated by executive agencies. The Executive Branch has terminated the Program based on policies that are entirely different than, and in many cases

directly in conflict with, the directives and purposes specified by Congress for expending the funds.

129. By refusing to expend appropriated funds based on the *President's* priorities rather than "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025 WL 357368, at *50.

130. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II and are thus "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B).

131. Third, these agency actions are contrary to the IRA, which appropriated money to the Program at issue here. Defendants' actions are inconsistent with the statutory requirements to create, fund, and carry out the Program. *See* Section 60112 of the IRA(a) (appropriating "to the Administrator of the Environmental Protection Agency for fiscal year 2022 . . . $250,000,000 to develop and carry out a program to support the development, enhanced standardization and transparency, and reporting criteria for environmental product declarations that include measurements of the embodied greenhouse gas emissions of the material or product associated with all relevant stages of production, use, and disposal, and conform with international standards, for construction materials and products").

132. Fourth, these agency actions are contrary to the Impoundment Control Act of 1974 ("ICA"). 2 U.S.C. § 682(1). Defendants, through these terminations, have unlawfully withheld the expenditure of funds. Defendants initially deferred the funds for impermissible policy reasons and without following the ICA's requirements for notifying Congress, and then unilaterally rescinded the funds, contravening the ICA's requirement that should the President

seek such a rescission he must request it of Congress and *Congress* must act to rescind the funds. 2 U.S.C. § 683(b).

133. EPA's decision to terminate the Program authorized by Section 60112 of the IRA is in excess of the agency's statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

134. For the reasons set forth above, EPA's elimination of the Program violates the Constitution, the IRA, the ICA and the APA. It also violates Congress's express instruction that the appropriated funds be obligated.

135. EPA's decision to eliminate the Program authorized by Section 60112 of the IRA and intention to de-obligate the previously awarded funds is in excess of the agency's statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

## **PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the following relief:

A. Issue a declaratory judgment that the termination of the Program authorized by Section 60112 of the IRA and the termination of legally-obligated grant awards issued under the program violates the United States Constitution, the statutory provisions enacting and appropriating funds to these programs;

B. Preliminarily and permanently enjoin EPA from taking action to terminate the Program authorized by Section 60112 of the IRA;

C. Require EPA to reinstate the grant award to Plaintiff previously authorized by Section 60112 of the IRA that were terminated pursuant to these unlawful actions;

D. Require EPA to extend the period of performance to allow Plaintiff to complete the period of performance specified in its grant agreement, accounting for the time between the time Plaintiff lost access to the grant funding and this Court's order;

E. Require EPA to make adequate staffing and other resources available to effectuate Plaintiff's grant award;

F. Retain jurisdiction over this matter to ensure compliance with the above relief;

G. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, in accordance with law pursuant to 28 U.S.C. § 2412; and

H. Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted this 31st day of July 2025,

*/s/ Timothy R. Oberleiton*
Timothy R. Oberleiton (D.D.C. Bar No. 1617107)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
toberleiton@earthjustice.org

Meghan L. Riley (Tx. Bar No. 24049373) (*Pro Hac Vice Motion* forthcoming)
EARTHJUSTICE
845 Texas Avenue, Suite 200
Houston, TX 77002
(512) 436-3988
mriley@earthjustice.org

*Counsel for Plaintiff*
*Building Materials Re-use Association*

27